UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JAMES A. MUDD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No.: 1:15-CV-177 |
| | ) |
| CITY OF NEW HAVEN, INDIANA, and | ) |
| OFFICER JAMES KRUEGER, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

This matter is before the court on the motion for summary judgment filed by Defendants City of New Haven, Indiana, and Officer James Krueger on April 18, 2016 (DE 30). Plaintiff James Mudd filed a response in opposition to the motion on May 12, 2016 (DE 35) and Defendants filed a reply brief on May 23, 2016 (DE 36). For the reasons discussed below, the motion for summary judgment is GRANTED and this case is DISMISSED WITH PREJUDICE.

## BACKGROUND

The material facts giving rise to this lawsuit are mostly undisputed. On December 29, 2013, at approximately 2:30 a.m., Mudd was pulled over for speeding by New Haven police officer James Krueger. After Krueger stopped Mudd's vehicle, he saw Mudd lean over to reach for something in the vehicle. Fearing that Mudd might have a weapon, Krueger drew his service revolver and kept it pointed at Mudd until backup arrived,[1] at which time Mudd was instructed to

---

[1] The record before the court is vague about the amount of time that elapsed between the initial traffic stop and the arrival of the backup officer (or more specifically, the amount of time Krueger kept his firearm pointed at Mudd). Mudd's complaint states only that "Officer Krueger called for back-up and continued to keep his gun trained on Plaintiff *while waiting for the arrival of a back-up officer*[.]" Third Amended Complaint, p. 2, ¶ 7 (italics added). The Defendants state that Krueger "pointed his weapon for *a short period of time* at the Plaintiff[,]" Defendants'

exit his vehicle and show his hands to officers. Mudd did so and Krueger saw that Mudd was holding his wallet in his left hand, so Krueger holstered his weapon. Krueger suspected that Mudd was intoxicated and administered a field sobriety test and portable breathalyzer test, the latter of which indicated a blood alcohol level of .16, twice the legal limit in Indiana. Krueger also obtained a search warrant for a blood draw, but Mudd refused to allow anyone to draw blood from him the morning of his arrest. A state court eventually ruled that Mudd was in contempt of court as a result of his refusal to submit to a blood draw and sentenced Mudd to 30 days in jail. The state court acquitted Mudd of the other charges arising out of his arrest on December 29, 2013. Mudd contends that he was not speeding or intoxicated when he was stopped. At no point during his encounter with police did Mudd resist officers, threaten them, or attempt to flee.

The parties present and argue about many more facts, but most of them are either not determinative or not really relevant at all. The facts just recited form the foundation of Mudd's complaint, in which he asserts the following:

1) a claim against the City of New Haven for "unconstitutional/constitutionally deficient policies, practices, procedures, and/or customs in effect (including the custom and policy of inadequate

---

Memorandum, p. 2 (italics added), which is equally vague. Krueger's incident report also does not state long he kept his gun pointed at Mudd. *See* Officer Supplemental Report (DE 31-3), pp. 5-7. The Defendants' state in their brief that Mudd "testified in his deposition that *after several minutes* a backup police car arrived[.]" Defendants' Memorandum, p. 2 (italics added). But even this statement appears to be a paraphrase, since Mudd doesn't use the phrase "after several minutes" anywhere in his deposition. The closest the record comes to answering this question is Mudd's deposition testimony, when he stated that "[a]pproximately maybe four or five minutes[]" elapsed between the time he was pulled over until the backup officer arrived. Mudd Deposition (DE 34-1), pp. 98-99. For present purposes, the court will accept Mudd's estimation and assume that Krueger pointed his gun at Mudd for four or five minutes. (Mudd contends that Krueger had no justification for pointing his weapon at him, regardless of how long he did so. Ultimately, this factual question is not determinative, although it does factor into the court's analysis of Mudd's claims, as discussed below.)

training) that resulted in the excessive and unreasonable force Plaintiff suffered the hands of Officer Krueger in violation of Plaintiff's federally protected rights under the Fourth Amendment and 42 U.S.C. § 1983[.]" (Third Amended Complaint (DE 23)), p. 1-2;

2) an excessive force claim against Krueger (*Id*., p. 2); and

3) a Fourth Amendment claim and/or state law claim against Krueger for false arrest (*Id*., p. 3).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

**DISCUSSION**

**I. Claim against City of New Haven.**

Mudd brought his claim against the City of New Haven pursuant to *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 659 (1978). Amended Complaint, pp. 1, 3. In his response brief, however, Mudd states that he "agrees to dismiss his *Monell* claims against the City of New Haven, with prejudice." Plaintiff's Response, pp. 9-10. Accordingly, Mudd's claim against the City of New Haven is DISMISSED WITH PREJUDICE.

**II. Excessive force claim.**

"'In order to establish an excessive force claim under § 1983, plaintiffs must demonstrate that a state actor's use of force was 'objectively unreasonable' under the circumstances.'" *Jones v. Philips, et al.*, 2016 WL 3255022, at *3 (E.D. Wis. June 13, 2016) (quoting *Thomas v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). . . . "An officer's use of force is unreasonable from a constitutional point of view only if, 'judging from the totality of the circumstances at the time of the arrest, the officer used force greater than necessary to make the arrest.'" *Id*. (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009)).

The analytical framework the court follows to assess such claims is as follows:

> Where, as here, an excessive force claim "arises in the context of an arrest or

investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . " *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Determining whether force used to effect a seizure is "reasonable" under the Fourth Amendment[:]

> requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake . . . Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.
>
> *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871 (citations omitted). The test, in short, is one of "objective reasonableness," to be determined from the totality of the circumstances. *O'Toole v. Kalmar*, 1990 WL 19542 . . . (N.D.Ill. 1990). Because the governing test is objective, excessive force claims are "susceptible to summary judgment determinations . . . fewer cases should require a full-blown trial for resolution." *Id.*

*Smith v. City of Joliet*, 809 F.Supp. 48, 49-50 (N.D. Ill. 1991), *aff'd*, 965 F.2d 235 (7th Cir. 1992). The Supreme Court explained in *Graham v. Connor* that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

So, in every claim for excessive force, the issue is the reasonableness of the officer's conduct, the assessment of which is based on the totality of the circumstances of the specific incident giving rise to that claim. Krueger claims he saw Mudd lean over and reach for something inside his vehicle as Krueger was approaching Mudd's car. Fearing for his safety, Krueger pointed his weapon at Mudd until backup arrived, then holstered his weapon once he

realized that Mudd was holding only his wallet. In his incident report, Krueger wrote the following:

> I could see the driver moving his hands around quickly inside the cab of the vehicle and was not sure of [sic] what he was doing. I could see in the rear view mirror the driver had a shirt or mask over the bottom portion of his face. In fear he was getting a gun with his quick hand movements I un-holstered my duty weapon and pointed it at the vehicle and waited for back up. I yelled at the driver to open his window but he would not comply. The driver then started to open the back passenger side window and then partially opened his window. When [backup] Officer Lewis arrived I ordered the driver to step out of the vehicle with his hands shown [sic].

Krueger Incident Report (DE 31-3), p. 5. It was at that point that Krueger realized Mudd was holding his wallet, not a weapon, so Krueger holstered his weapon.

In his deposition testimony, Mudd confirmed that he leaned over to retrieve his wallet after Krueger stopped him. Mudd Deposition (DE 31-1), pp. 57-58. In fact, Mudd's testimony confirms Krueger's version of the events. Mudd testified as follows:

> Q.: And did you turn around to see [Krueger] pull the gun?
>
> A.: Yes.
>
> Q.: So you were moving your body around . . . ?
>
> A.: I could see him aiming his gun at me in my rearview mirror.
>
> Q.: What was he saying to you?
>
> A.: Yelling for me to get out of the car. I was so frightened I hesitated. I didn't understand why, one, I was pulled over. Two, immediately why I was being screamed at and yelled at and told to exit my vehicle with my hands up.
>
> Q.: So you did not exit the vehicle on his command?
>
> A.: I looked for my wallet, and I reached for my wallet, and when I got that I exited the vehicle.

> . . .
>
> Q.: In your physical description you started reaching toward the console with our left hand?
>
> A.: I simply just reached, opened my–it's like a glove compartment thing right there in the middle of that particular vehicle, right next to the driver's seat. In between the passenger's seat and driver's seat. With my right hand I reached over and opened the top of it. With my left hand I simply grabbed my wallet. And at that point he's yelling at me, screaming at me.
>
> . . .
>
> Q.: And he was telling you to get out of the vehicle; correct?
>
> A.: Yes.
>
> Q.: . . . Instead of getting out of the car right away, the next step that you did was reach down to pick something up, which happened to be your wallet, is that correct, out of your console?
>
> A.: To the best of my recollection that's that way that the event went. It could have been different. I really don't recall. At that particular moment I was frightened. . . .
>
> Q.: Then you got your wallet after he's telling you to get out of the car. Do you immediately get out of the car, or do you sit there?
>
> A.: I believe I attempted to roll the window down to at least show my wallet. And my driver's side window didn't roll down, so I rolled the rear window down and said I'm getting out of the car, I'm getting out of the car. . . . I see this gun at me. Don't shoot. So when I get out of the car I got my hands up in the air with my wallet in my left hand.

*Id.*, pp. 57-60. Mudd also confirmed that after he exited his vehicle and Krueger saw the wallet the officer holstered his weapon. *Id.*, pp. 60-61.

Mudd's own testimony, then, confirms Krueger's version of events, even down to details such as Mudd's movements inside his vehicle and his attempts to roll down his car window. So, the undisputed facts reveal that Krueger stopped Mudd for speeding, saw Mudd make some

7

movement inside his vehicle after he pulled over, and feared that Mudd might be armed. Krueger pointed his service weapon at Mudd's car and called for backup. Krueger kept his weapon pointed at Mudd's vehicle for "maybe four to five minutes," then holstered his weapon once a backup officer arrived and Krueger was finally able to see that Mudd did not have a weapon. The court does not doubt that this encounter was disconcerting and tense for both Mudd and Krueger. Given the unfortunate realities of the times, encounters between police officers and citizens are often fraught with tension and suspicion on both sides. Mudd, for example, testified that "in my understanding this officer pulled a gun on me, screamed and yelled at me while the gun was pointed at me, in a–to me a horrific and frightening and intimidating, unnecessary way." Mudd Deposition, p. 56. Mudd testified that he was so frightened at having a gun pointed at him that he urinated on himself. *Id*., p. 99. (The Defendants imply that Mudd urinated on himself not out of fear, but because he had consumed too much alcohol and his "bladder [was] full," but Mudd insisted that it was because the encounter "was so intimidating, I was so frightened." *Id*., pp. 104-05.) Fortunately, the situation did not escalate and Mudd was arrested without incident. But while the court is sympathetic to Mudd's subjective response to the incident, an objective assessment of Krueger's actions under the circumstances of this case shows that they did not rise to the level of a constitutional violation.

It is true that "[p]ointing a loaded gun at [a citizen] is a display of deadly force because it creates more than a remote possibility of death." *Schall v. Vazquez*, 322 F.Supp.2d 594, 600 (E.D. Pa. 2004). But it is equally well established that "while police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (emphasis in original); *see*

*also Wilkins v. May*, 872 F.2d 190, 194 (7th Cir.1989) ("[T]he action of a police officer in pointing a gun at a person is not, in and of itself, actionable . . . Where the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution"); *Williams v. City of Champaign*, 524 F.3d 826, 826 (7th Cir. 2008) (when police officer believes occupant of vehicle might be armed, he must "approach with utmost caution, which may include pointing a gun at the occupants."); *Foote v. Dunagan*, 33 F.3d 445, 448 (4th Cir. 1994) (an officer is "'authorized to take such steps as [are] reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of [a *Terry* ] stop.'") (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *United States v. Sinclair*, 983 F.2d 598, 602–03 (4th Cir. 1993) (reasonable to draw weapons when stopping suspected drug traffickers even though officers had no reason to believe were armed and dangerous); *United States v. Seni*, 662 F.2d 277, 283 (4th Cir. 1981) (drawing gun reasonable safety precaution where officers have reasonable suspicion of criminal activity), *cert. denied sub nom. Minton v. United States*, 455 U.S. 950 (1982).

The cases Mudd cites in support of his position that Krueger's display of force was unreasonable are factually distinguishable. They include egregious examples of the use of deadly force by police–examples that are objectively unreasonable on their face. *See* Plaintiff's Memorandum, pp. 8-9 (citing *Baird*, 576 F.3d 340 (7th Cir. 2009)) (excessive force where officer pointed submachine gun at auto shop workers while serving a warrant to search for alleged false vehicle identification numbers); *Jacobs v. City of Chicago*, 215 .3d 758, 773-74 (7th Cir. 2000) (excessive force when officer pointed service weapon at elderly man for ten minutes even though he was not a suspect and was not resisting); *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992)

9

(officer's conduct was objectively unreasonable when he pointed his gun at a nine-year-old child). But the circumstances in the present case are starkly different. Mudd was pulled over for speeding at 2:30 in the morning and admitted in his deposition testimony that he made a movement inside his car after he was stopped. Notwithstanding the fact that Krueger's concern about the possible presence of a weapon turned out to be wrong, it defies logic to argue that it was objectively unreasonable for him to protect himself–even by pointing his weapon at Mudd–until backup arrived and Krueger could more safely assess the situation. Finally, it is undisputed that as soon as Krueger realized that Mudd was not armed, he secured his firearm. The court concludes that the totality of the circumstances warranted Krueger's brief display of force and was objectively reasonable based on the totality of the circumstances. Mudd's own deposition testimony confirms Krueger's version of events. No credibility determinations or the weighing of any evidence is necessary to resolve this claim, and so summary judgment is appropriate.

**III. False arrest claim.**

Mudd's false arrest claim is contained in one sentence in his complaint, in which he asserts that "Officer Krueger arrested [Mudd] without probable cause in violation of Plaintiff's right to be free from false arrest under the Fourth Amendment, 42 U.S.C. § 1983 and the laws and public policies of the State of Indiana." Third Amended Complaint, p. 3, ¶ 12. Mudd elaborates on this a bit in his memorandum, contending that "[a]t the time of the stop, there was no reason to arrest and hold Mudd at gunpoint when he was merely pulled over for speeding. Officer Krueger lacked probable cause for such action." Plaintiff's Memorandum, p. 6 (citation omitted). Mudd further contends that "[n]ot only did Officer Krueger lack probable

cause to detain Mudd at gunpoint, [j]udgment was rendered in favor of Mudd following a bench trial . . ." on the charges of driving while intoxicated and speeding. *Id*., p. 7. Based on this premise, Mudd alleges that his arrest was illegal.

The Defendants argue in their memorandum that Krueger had a legitimate reason to stop Mudd (he believed Mudd was speeding) and a legitimate reason to draw his weapon (after seeing Mudd reach for something in his car)–conduct the court has concluded was reasonable under the circumstances. Then, after Mudd exited his vehicle, Krueger smelled alcohol and observed that Mudd was unsteady on his feet. Krueger administered a field sobriety test and portable breathalyzer test, both of which indicated to Krueger that Mudd was intoxicated. Even though a state court ultimately acquitted Mudd of the charges, Krueger still had probable cause to arrest Mudd. Mudd disagrees, arguing that while he was pulled over only for speeding, Krueger immediately (and illegally) "arrested" him when he pointed his weapon at Mudd while waiting for backup. Mudd also seems to imply that since he was later acquitted of the charges, Krueger therefore lacked probable cause to arrest him. This is a convoluted argument that improperly merges the elements of law regarding false arrest claims and malicious prosecution claims. Because Krueger had a legitimate reason to draw his weapon and detain Mudd (who, granted, was not free to leave at that point), that action did not constitute false arrest or illegal seizure. And, once Krueger suspected that Mudd was intoxicated and verified that suspicion with a field sobriety test and breathalyzer test, he had probable cause to arrest Mudd. The fact that Mudd was later acquitted of the charges is not relevant. It might be relevant, if Mudd was asserting a claim for malicious prosecution, since one of the elements of such a claim is that the charges levied against a plaintiff are subsequently "terminated in the plaintiff's favor." *Welton v. Anderson*, 770

11

F.3d 670, 674 (7th Cir. 2014). But as Mudd himself points out, he "did not plead a malicious prosecution claim and does not allege one at this time." Plaintiff's Memorandum, p. 6, n. 3. The fact that Mudd was acquitted of the charges stemming from this incident is irrelevant to a false arrest claim.[2]

Mudd's false arrest claim rests on his assertion that Krueger had no right to detain him at gunpoint merely because Mudd was allegedly speeding. But as the court has already explained, the evidence reveals that is not what happened. Krueger detained Mudd at gunpoint because he was concerned that Mudd might be armed, not because of the alleged traffic offense. Mudd's claim for false arrest cannot stand when the court has already concluded that the detention was warranted under the circumstances. That is, Mudd's claim is based on the assumption that Krueger had no reason to immediately detain (or seize) him. Since Krueger's actions were reasonable, and since he clearly had probable cause to arrest Mudd for suspicion of drunk driving, Mudd's false arrest claim is unfounded.

Mudd's false arrest claim also has (or had, at the time it was asserted) another potential basis. Mudd contends (or at least implies) that his arrest for driving while intoxicated was based on an illegal breathalyzer test, i.e., that such a test requires a warrant before it can be

---

[2] Mudd notes that the Defendants include in their memorandum "a brief argument regarding malicious prosecution[,]" and then states that he has never asserted such a claim. This is true, as the Defendants state in their brief that "Mudd's claims against the Defendants are without merit and cannot withstand summary judgment, with respect to the state law claims of false arrest and malicious prosecution." Defendants' Memorandum, p. 5. The Defendants then go on to argue that Mudd cannot establish "either a lack of probable cause or the presence of malice, both of which are necessary for any state tort claim as to malicious prosecution." *Id.*, p. 6. But since Mudd concedes that he is not pursuing such a claim, the Defendants' argument on this point is not relevant, just as Mudd's inclusion of the fact that he was acquitted of the charges against him is not relevant to a false arrest claim (since it is not an element of such a claim).

administered. Mudd stated in his brief that "[c]urrently, a relevant case is pending before the Supreme Court in *Birchfield v. North Dakota*. . . . In *Birchfield*, the [C]ourt will analyze whether refusing a breath alcohol or blood alcohol test during a traffic stop can be grounds for arrest or the basis for a crime." Plaintiff's Memorandum, p. 1, n. 1. The *Birchfield* case was decided on June 23, 2016, while the present motion for summary judgment was pending, and the Supreme Court held that no warrant is required for a police officer to administer a field breathalyzer test to a suspected drunk driver, but that a blood draw, being a much more physically intrusive procedure, *does* require a warrant. *Birchfield v. North Dakota*, 579 U.S. ___, 136 S.Ct. 2160 (2016). Consequently, there was nothing unconstitutional about Krueger's administration of a field sobriety test or portable breathalyzer test, and he had probable cause to arrest Mudd after he administered those tests. The holding in *Birchfield*, therefore, precludes Mudd's false arrest claim, to the extent it is (or was potentially) based on the position that his arrest was illegal because Krueger administered field sobriety tests without a warrant.[3]

---

[3] Mudd never expressly states that his false arrest claim is based on an argument that the breathalyzer test was unconstitutional, but the argument is implied by virtue of Mudd's reference to the *Birchfield* case and his contention in his brief that his case "should not be decided on summary judgment when there is a relevant case pending before the U.S. Supreme Court." Plaintiff's Memorandum, p. 3. In light of *Birchfield*, Krueger's actions in administering a field sobriety test and breathalyzer test did not require a warrant and, in any event, Mudd did not refuse to submit to them. And, of course, Krueger *did* obtain a warrant for a blood draw, so no Fourth Amendment right was even implicated in that regard. The issue in *Birchfield* was whether individuals who refuse to submit to a *warrantless* breath test or blood draw could be charged with a crime for their refusal to do so. The Supreme Court held that they cannot, since a blood draw is a sufficiently invasive procedure so as to except it from the "search incident to arrest" doctrine and require officers to obtain a warrant in order for such a procedure to pass constitutional muster. Mudd's refusal to submit to a blood draw *after* a warrant was obtained, and presumably his state court conviction based on that refusal, appear to be unaffected by the holding in *Birchfield*; so the case, it turns out, is relevant here because it reaffirms the legality (that is, the constitutionality) of Krueger's decision to administer a field sobriety test and breathalyzer test, which in turn provided probable cause for Mudd's arrest.

It is not entirely clear whether Mudd's "false arrest" claim is a state law claim, a Fourth Amendment claim for unreasonable seizure of the person, or both. The language in his complaint seems to make clear that he is alleging both, since he states that he was "arrested . . . without probable cause in violation of Plaintiff's right to be free from false arrest under the Fourth Amendment, 42 U.S.C. § 1983 and the laws and public policies of the State of Indiana." Third Amended Complaint, p. 3, ¶ 12. Either way, the claim fails.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. The Fourth Amendment's protections apply to arrests as well as to brief investigatory stops . . . that fall short of traditional arrests. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "An officer's temporary detention of an individual . . . constitutes a seizure of a person . . . and thus must be reasonable under the circumstances. *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014). *See also*, *Still v. Indiana State Police*, 2016 WL 1270338, at *9 (N.D. Ind. Mar. 31, 2016) (the Fourth Amendment guarantees citizens the right "'to be secure in their persons . . . against unreasonable . . . seizures' of the person.") (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

As the Supreme Court has explained:

> The reasonableness of limited seizures of the person recognized in *Terry* [*v. Ohio*] and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures." . . . . We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*United States v. Place*, 462 U.S. 696, 703 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct.

1868, 1879 (1968)). Because the court concludes that Krueger's actions were reasonable, and that he had probable cause to arrest Mudd completely apart from the speeding offense, Mudd has no claim for illegal seizure in violation of the Fourth Amendment.

As the Seventh Circuit explained in *Howlett v. Hack*, 794 F.3d 721 (7th Cir. 2015): "[F]or a claim of false arrest to succeed under Indiana law, there must be an 'absence of probable cause.' *Row v. Holt,* 864 N.E.2d 1011, 1016 (Ind. 2007). . . . An officer has probable cause for an arrest when 'at the time of the arrest the facts and circumstances within the knowledge of the officer[ ] and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man of reasonable caution in believing that the arrestee had committed or was committing an offense.' *Smith v. State*, 271 N.E.2d 133, 136 (1971); *see also Riggenbach v. State*, 397 N.E.2d 953, 954–55 (1979)." *Howlett*, 794 F.3d at 726-27. Furthermore, as set forth in *Still*:

> In order "[t]o prevail on a claim of false arrest, the plaintiff must show there was no probable cause for his arrest." *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010) (citing *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007)). Where "probable cause to arrest is found to exist, it 'is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest.'" *Id.* (quoting *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006)). "Where a police officer 'has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'" *Ray v. City of Chi.*, 629 F.3d 660, 663 (7th Cir. 2011) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). "This is true even if the minor criminal offense is a traffic offense." *Id.* (citing *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002)). Thus, "[s]o long as a police officer has probable cause to believe that a person has committed a crime, then it is not constitutionally relevant whether 'the person was arrested on . . . charges for which there was no probable cause.'" *Id.* . . . (quoting *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)).

*Still*, 2016 WL 1270338, at *7. "[T]he existence of probable cause is an absolute bar to a § 1983

claim for false arrest." *Grimes v. Gary Cmty. Sch. Corp.*, 2016 WL 1162370, at *5 (N.D. Ind. Mar. 23, 2016) (citing *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1113 (7th Cir. 1997)).

Again, the evidence shows that Krueger had probable cause to arrest Mudd. Krueger believed Mudd was speeding based on his in-car radar and his own observations; he administered legal field sobriety tests after smelling alcohol and noticing that Mudd appeared unsteady on his feet and had urinated on himself; and he arrested Mudd for both offenses. Mudd presents little evidence to refute these facts, other than his self-serving assertions that he was *not* speeding and was *not* drunk. While such statements, "even if 'self-serving,' may defeat a motion for summary judgment" under some circumstances, *see Patterson v. Triangle Tool Corp.*, 2016 WL 3519617, at *5 (E.D. Wis. June 22, 2016), they do not do so here. That is because an assessment of "'probable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*–seeing what he saw, hearing what he heard.'" *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 456–57 (7th Cir. 2010) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)) (italics in original); *see also Williams v. Rodriguez,* 509 F.3d 392, 398 (7th Cir. 2007) (probable cause exists if "the facts and circumstances within [the officers'] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense."). Krueger had "trustworthy information" in the form of his radar detector, his personal observations, and the results of the field sobriety test and portable breathalyzer test, to justify both the initial traffic stop and the subsequent arrest of Mudd on suspicion of speeding and driving while intoxicated. Mudd's assertions that he was not speeding and was not drunk are insufficient to raise a material issue of fact with regard to

16

probable cause, since an objective assessment shows that Krueger had sufficient trustworthy information to believe that Mudd committed the offenses of speeding and driving while intoxicated, thereby providing probable cause for his arrest on both charges. For these reasons, Krueger is entitled to summary judgment on Mudd's false arrest claim.

## CONCLUSION

For the reasons discussed above, the motion for summary judgment filed by Defendants City of New Haven and James Krueger is GRANTED and this case is DISMISSED WITH PREJUDICE.

Date: July 25, 2016.

/s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana